## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

ARTHUR S. HADLEY,                    :

      Plaintiff,                    :
                      Case No. 3:13cv00007

vs.                                  :
                  District Judge Walter Herbert Rice

CAROLYN W. COLVIN,                   :     Chief Magistrate Judge Sharon L. Ovington
Acting Commissioner of the Social
Security Administration,             :

      Defendant.                    :

_____

## REPORT AND RECOMMENDATIONS[1]

_____

### I.    <u>Introduction</u>

Plaintiff Arthur S. Hadley brings this case challenging the Social Security

Administration's denial of his application for Disability Insurance Benefits (DIB).

Plaintiff filed his DIB application on March 6, 2009, asserting that he has been under a

"disability" since October 10, 2008.  (*PageID## 185-92*).  Plaintiff claims to be disabled

due to "lung blood clots, hepatitis-c, restless leg syndrome, [and] sleep apnea." (*PageID#*

235).

After various administrative proceedings, Administrative Law Judge (ALJ) Amelia

G. Lombardo denied Plaintiff's application based on her conclusion that Plaintiff's

impairments did not constitute a "disability" within the meaning of the Social Security

_____

[1]Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

Act. (*PageID## 44-58*). The ALJ's nondisability determination and the resulting denial of benefits later became the final decision of the Social Security Administration. This Court has jurisdiction to review the administrative denial of his application. *See* 42 U.S.C. §§ 405(g), 1383(c)(3).

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #10), the administrative record (Doc. # 6), and the record as a whole.[2]

## II.    Background

### A.    Plaintiff's Vocational Profile and Testimony[3]

Plaintiff was 48 years old on the alleged disability onset date, which defined him as a "younger person" on the alleged disability onset date. *See* 20 C.F.R. §§ 404.1563(c); *PageID#* 57. He subsequently changed age category to "closely approaching advanced age." *See* 20 C.F.R. §§ 404.1563(d); *PageID#* 57. Plaintiff has a high school education. (*PageID#* 71).

Plaintiff testified that he is married and lives with his wife in a one-story house. (*PageID#* 70). He stated he can drive but only drives approximately 1 mile each week to the grocery store. (*PageID#* 71). Plaintiff testified that he has headaches "all of the time" and is unable to "hold things or grab things hardly anymore." (*PageID#* 73). Plaintiff

_____

[2] Plaintiff did not file a Reply to the Commissioner's Memorandum in Opposition.

[3] As resolution of the issues presented in this case does not involve vocational expert testimony, the Court will, accordingly, not summarize such evidence.

stated that he is unable to open jars "and things of that nature." (*Id.*). He believes this is due to nerve damage that resulted from when he "had the pulmonary embolism because [he] had a lot of oxygen or no oxygen to [his] brain." (*Id.*). Plaintiff testified that when the pulmonary embolism occurred he fell down, hit the ground, and "for a short period of time wasn't breathing." (*Id.*). Plaintiff believes the problems with his hands, legs, and lungs are due to this incident. Plaintiff also testified that he has restless leg syndrome and bad memory loss. (*Id.*).

Plaintiff testified that he is a recovering drug addict. He stated he is going to church and seeing a therapist for treatment. (*PageID#* 74). He explained he has not done any kind of inpatient treatment because he cannot afford it. (*PageID#* 75).

Plaintiff stated that he is unable to walk for a long distance or stand up for "too long" because he will pass out. (*PageID#* 76). He estimated that he gets dizzy after walking 150 feet. If he tries to walk for 15 minutes, he stated he will pass out no "matter what day it is . . . ." (*PageID#* 76). Plaintiff testified that in the summer, when it is warmer outside, he "cannot go outside at all." (*Id.*). Plaintiff attributes these difficulties to his lung function. He testified "there's no way I could ever be outside to do any type of work at all . . ." (*Id.*).

Plaintiff estimated that he can sit for 10 to 15 minutes before his leg gets numb. (*PageID#* 76). He stated his leg was "already numb," while he was testifying. Plaintiff attributes this to poor blood circulation. He estimated he can only stand for "[t]en minutes, probably five minutes on bad days, ten minutes on a good day." (*PageID#* 77).

3

Plaintiff testified that he believes he can only lift approximately eight pounds but is unable to do that constantly. (*Id.*). He testified that "generally on average" he is "probably awake approximately four hours a day." (*Id.*). He stated he "can't stay awake." (*Id.*). He testified he helps his wife minimally. (*Id.*) Plaintiff stated his difficulty staying awake has been occurring for two years.

Plaintiff testified he has suicidal thoughts "[j]ust about any time that my wife and I are sitting there and we're trying to figure out how to pay the bills that I don't have money to pay or anytime that I'm sitting there and somebody tells me go get a job . . ." (*PageID#* 78-79). Plaintiff stated he was using cocaine approximately a year prior to the hearing.[4] (*PageID#* 80).

Plaintiff believes his inability to stand or sit for long periods of time; inability to grasp objects; restless leg syndrome; and constant migraine headaches are the "main physical problems" that prevent him from working. (*PageID#* 81). Plaintiff testified that he has migraine headaches "24 hours a day" and that "[t]hey're always there." (*PageID#* 81). He stated that since his doctor prescribed Topomax, his migraines have been "about half as bad as they used to be . . ." (*PageID#* 82). He estimated the headache pain as being 5 out of 10, but occurring on a constant basis. (*Id.*).

Plaintiff also has Hepatitis C, and underwent Interferon treatment from February 2009 to January 2010. (*PageID#* 83). During this time, Plaintiff had to inject himself

---

[4] The hearing was held on January 25, 2011. (*PageID#* 67).

with the medication one day per week.  He stated after the injections that he would sleep

for "48 straight hours, not eating, not drinking, not moving for two solid days."

(*PageID#* 84).  He testified he would also go without eating for four days.  (*Id.*).  Plaintiff

stated he still suffers from some symptoms, such as chills and fatigue.  (*PageID#* 85).  He

also testified he is unable to go up and down stairs "at all."  (*Id.*).

Plaintiff stated that he has problems learning and believes this is due to the fact

that "[t]oo many brain cells were killed and died off when I lost the oxygen to my brain

when I had my pulmonary embolism . . ." (*PageID#* 87).  Plaintiff testified that he used

to be very good at math but now is "lucky if [he] can add two numbers anymore in [his]

head." (*PageID#* 88).  He stated this is "quite irritating because, I mean, when you used

to be able to do things that were so simple and now you can't it just drives you nuts.  I

mean, it's like some days I hate myself."  (*PageID#* 88).

### B. <u>Treatment History and Relevant Medical Opinions</u>

Plaintiff was hospitalized from February 21-25, 2008 due to pulmonary embolus

(*PageID##* 293-323).  The discharge diagnoses were acute pulmonary embolus,

polycythemia, proteinuria, history of hepatitis C, active smoking, alcohol abuse, history

of intravenous drug abuse, and possible obstructive sleep apnea/sleep-disordered

breathing.  (*PageID#* 297).  Plaintiff was prescribed anticoagulants upon discharge.  (*Id.*).

In March 2008, Plaintiff underwent testing for possible sleep-disordered breathing.

Plaintiff was ultimately prescribed a continuous positive airway pressure (CPAP)

machine by Dr. Dharmesh V. Gandhi.  (*PageID#* 347).  In June 2008, Dr. Gandhi noted

5

that Plaintiff "is compliant with the CPAP with a nice improvement in his daytime tiredness and sleepiness." (*Id.*).

In April 2008, a liver biopsy was performed, which revealed hepatitis C with mild portal inflammatory activity and portal fibrous widening with rare portal septa. (*PageID#* 429). In September 2008, Dr. Niaz Usman treated Plaintiff and noted that "he remains asymptomatic from the hepatitis C standpoint. He reports no abdominal pain, no nausea or vomiting, and no significant fatigue, arthritis, or arthralgias." (*PageID#* 447). In December 2008, Dr. Usman noted that Plaintiff "had an episode of viral gastroenteritis a few weeks ago" and has "some fatigue." (*PageID#* 448). Dr. Usman reported that Plaintiff "smokes a pack a day and also drinks moderately." (*Id.*).

In April 2009, Plaintiff again treated with Dr. Gandhi. (*PageID#* 588). Plaintiff complained of shortness of breath during testing at the pulmonary physician's office. (*Id.*). Dr. Gandhi noted that Plaintiff continues to smoke cigarettes and "also smokes cocaine about two days a week and has done so for many years." (*Id.*). Dr. Gandhi noted only mild airflow obstruction. (*Id.*).

In May 2009, the Ohio Bureau of Disability Determination (BDD) requested that Damian Danopulos, M.D., perform pulmonary function testing on Plaintiff. (*PageID##* 602-07). Testing revealed a mild degree of obstructive lung disease without restrictive component. In June 2009, Dimitri Teague, M.D., reviewed the medical record on behalf of the Ohio BDD in order to assess Plaintiff's physical residual functional capacity. (*PageID##* 608-16). Dr. Teague concluded that Plaintiff could occasionally lift and/or

6

carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about 6 hours in an 8-hour workday; sit for a total of about 6 hours in an 8-hour workday; and push and/or pull without limitation. (*PageID#* 609). Dr. Teague did not believe Plaintiff could ever climb ladders, ropes, or scaffolds. (*PageID#* 615). In November 2009, Ohio BDD reviewing physician Walter Holbrook, M.D. concurred with Dr. Teague's assessment. (*PageID#* 670).

In October 2009, psychologist Stephen Halmi, PhD examined the claimant on behalf of the BDD in order to assess his mental functional ability. (*PageID#* 642-50). Plaintiff reported to Dr. Halmi that he is treated by Dr. Vantrease (his primary care phsyician), Dr. Usman (for Hepatitis C), Dr. Jain (for hepatitis and anemia), and Dr. Gandhi (a sleep specialist). (*PageID#* 644). Plaintiff reported to Dr. Halmi that he did not abuse alcohol and "has used marijuana and cocaine, but has been sober from them for ten years . . . . He does not use illegal drugs." (*PageID#* 644).

On August 2, 2010, Priya G. Jain, M.D., wrote a letter discussing Plaintiff's pulmonary embolism, hepatitis C, and hypercoagulable state. Dr. Jain opined, "I feel that all of these symptoms and his medical diagnoses as listed above do significantly limit his ability to work on a full-time basis or work at all especially during the time when he was on treatment with ribavirin and interferon." (*PageID#* 685).

On August 20, 2010, Plaintiff's primary care physician, Lisa R. Vantrease, M.D., submitted a letter discussing Plaintiff's medical history. (*PageID##* 687-88). She treated Plaintiff for two years. (*PageID#* 688). She discussed his pulmonary embolism,

7

Hepatitis C, headaches, vertigo, and mental health.  (*Id.*).  She ultimately opined that "[i]t is my opinion that the patient has been unable to work from February of 2009 until the present time due to the above medical conditions."  (*PageID#* 688).

In 2010, Plaintiff had a neurological consultation with Alan K. Jacobs, M.D. (*PageID#* 802).  Dr. Jacobs felt that "much of his symptomatology may reflect a combination of migraine-induced effects."  (*PageID#* 802).  Dr. Jacobs noted that Plaintiff "was successfully treated on several occasions with intravenous migraine therapies which quite strongly indicated that the source of his headache complaints were in fact migraine."  (*Id.*).  Dr. Jacobs noted in December 2010 that Plaintiff "had been requested for further followup although this has not occurred at this time from his last visit in August."  (*Id.*).

## III.  Administrative Review

### A.  "Disability" Defined

The Social Security Administration provides DIB to individuals who are under a "disability," among other eligibility requirements.  *Bowen v. City of New York*, 476 U.S. 467, 470 (1986); *see* 42 U.S.C. § 423(a)(1)(D).  The term "disability" – as defined by the Social Security Act – has specialized meaning of limited scope.  It encompasses only those who suffer from a medically determinable physical or mental impairment severe enough to prevent them from engaging in substantial gainful activity.  *See* 42 U.S.C. § 423(d)(1)(A); *see also Bowen*, 476 U.S. at 469-70.  A DIB applicant bears the ultimate burden of establishing that he or she is under a "disability."  *Key v. Callahan*, 109 F.3d

270, 274 (6th Cir. 1997); *see Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680,

683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

The term "disability" – as defined by the Social Security Act – carries a

specialized meaning of limited scope.  Narrowed to its statutory meaning, a "disability"

includes only physical or mental impairments that are "medically determinable" and

severe enough to prevent the claimant (1) from performing his or her past job, and (2)

from engaging in "substantial gainful activity" that is available in the regional or national

economies.  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

### B.    Social Security Regulations

Administrative regulations require ALJs to resolve a disability claim through a

five-Step sequential evaluation of the evidence.  *See PageID## 44-46; see also* 20 C.F.R.

§ 404.1520(a)(4).  Although a dispositive finding at any Step terminates the ALJ's

review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), the complete

sequential review answers five questions:

1.    Has the claimant engaged in substantial gainful activity?

2.    Does the claimant suffer from one or more severe impairments?

3.    Do the claimant's severe impairments, alone or in combination, meet or
equal the criteria of an impairment set forth in the Commissioner's Listing
of Impairments (the Listings), 20 C.F.R. Subpart P, Appendix 1?

4.    Considering the claimant's residual functional capacity (RFC), can he
perform his past relevant work?

5.    Considering the claimant's age, education, past work experience, and
residual functional capacity, can he or she perform other work available

9

in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

**C.     ALJ Lombardo's Decision**

ALJ Lombardo's pertinent findings began at Step 2 of the sequential evaluation where she concluded that Plaintiff has the severe impairments of: 1) history of pulmonary embolism; 2) sleep apnea; 3) chronic obstructive pulmonary disease (COPD); 4) hepatitis C; 5) mood disorder; and 6) anxiety disorder.  (*PageID#* 46).

The ALJ concluded at Step 3 that Plaintiff did not have an impairment or combination of impairments that met or equaled one in the Listings.  (*PageID#* 50).

At Step 4 the ALJ concluded that Plaintiff retained the RFC to perform light work,[5] provided it is low stress, defined as no assembly line production quotas nor fast paced; requires minimal contact with the public; and there is no exposure to extreme heat or cold.  (*PageID#* 52).

At Step 5, the ALJ found that considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that he can perform.  (*PageID##* 57-58).

The ALJ's findings throughout her sequential evaluation led her to ultimately conclude that Plaintiff was not under a disability and was therefore not eligible for DIB.

---

[5] The Regulations define light work as involving the ability to lift "no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds..." 20 C.F.R. § 404.1567(b).

(*PageID#* 58).

## IV.   <u>Judicial Review</u>

Judicial review of an ALJ's decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec*., 478 F.3d 742, 745-46 (6th Cir. 2007).

Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Soc. Sec*., 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld if the substantial evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry, reviewing for correctness the ALJ's legal criteria, may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to

follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## V. <u>Discussion</u>

### A. <u>The Parties' Contentions</u>

Plaintiff contends the ALJ failed to properly weigh the opinions of his treating sources, Drs. Vantrease and Jain.  (Doc. #7, *PageID##* 819-21).  Plaintiff argues that the ALJ should have given controlling weight to the opinions of Drs. Vantrease and Jain, and her failure to do so entitles Plaintiff to a reversal of the decision.  (Doc. #7, *PageID#* 821).  Plaintiff also argues that the ALJ failed to consider the effects of two impairments when determining his RFC.  (*Id.*).  Specifically, Plaintiff contends the ALJ failed to mention his migraine headaches or the effects of the Interferon treatment he underwent. (*Id.*).

Defendant argues that the ALJ properly weighed the opinions of Plaintiff's treating sources, Drs. Vantrease and Jain.  (Doc. #10, *PageID#* 837).  Defendant also contends the ALJ correctly accounted for Plaintiff's migraine headaches and Interferon treatment in her RFC finding. (Doc. #10, *PageID#* 845).  Defendant argues that the record as a whole supports the ALJ's conclusion that Plaintiff was not disabled, and the decision should be affirmed.  (*Id.*).

### B. <u>Weighing Medical Source Opinions</u>

The Sixth Circuit has held that claimants are "entitled to receive good reasons for the weight accorded their treating sources independent of their substantive right to receive disability benefits." *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875–76 (6th Cir. 2007); *see Cole v. Astrue*, 661 F.3d 931, 937–38 (6th Cir. 2011); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). "[T]he procedural requirement exists, in part, for claimants to understand why the administrative bureaucracy deems them not disabled when physicians are telling them that they are." *Smith*, 482 F.3d at 876; *see Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 368 (6th Cir. 2013).

Generally, "the opinions of treating physicians are entitled to controlling weight." *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540 (6th Cir. 2007), citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529-30 (6th Cir. 1997). However, "'[i]t is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record.'" *Blakley*, 582 F.3d at 406*, quoting* Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *2 (July 2, 1996). In *Wilson*, 378 F.3d at 546, the Sixth Circuit noted that a treating physician's opinion can be discounted if: (1) it is not supported by medically acceptable clinical and laboratory diagnostic techniques; (2) it is inconsistent with substantial evidence in the record; (3) it does not identify the evidence supporting its finding; and (4) if it fares poorly when applying the factors listed in 20 C.F.R. § 404.1527(d)(2), which include, *inter alia*, the length and frequency of examinations, the amount of evidence used to

13

support an opinion, the specialization of the physician, and consistency with the record.

Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's residual functional capacity. 20 C.F.R. § 404.1527(e). Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance. 20 C.F.R. § 404.1527(e); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

As to non-treating medical sources, the Regulations do not permit an ALJ to automatically accept or reject their opinions. *See* Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *2-*3. The Regulations explain, "[i]n deciding whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive." 20 C.F.R. §404.1527(b). To fulfill this promise, the Regulations require ALJs to evaluate non-treating medical source opinions under the factors set forth in § 404.1527(d) including, at a minium, the factors of supportability, consistency, and specialization. *See* 20 C.F.R. § 404.1572(f); *see also* Soc. Sec. Ruling 96-6p, 1996 WL 374180 at *2-*3.

### C.   <u>Analysis</u>

### 1.

Plaintiff contends the ALJ failed to provide good reasons for declining to give controlling or substantial weight to Dr. Vantrease's opinions that Plaintiff is disabled. (Doc. #7, *PageID*## 819-21). For the reasons that follow, the Court finds that Dr.

Vantrease's opinions were not entitled to controlling weight, and the ALJ provided good reasons for providing them "little weight." (*PageID##* 49, 55-57).

Dr. Vantrease opined in a letter dated August 20, 2010, that "[i]t is my opinion that [Plaintiff] has been unable to work from February of 2009 until the present time . . ." (*PageID##* 687-88). Dr. Vantrease also completed a "Medical Statement Regarding Disability for Social Security Disability Claim" form on August 19, 2010, in which she opined that Plaintiff could only stand for 30 minutes at one time; could only sit for 30 minutes at one time; could only work for 1 hour per day; and did not have the capacity to perform either full-time or part-time work. (*PageID#* 686). The ALJ ultimately concluded, "Dr. Vantrease's opinion is not entitled to controlling weight and is in fact, given little weight." (*PageID#* 56).

The ALJ noted that Dr. Vantrease's "opinion is inconsistent with the clinical examinations from either the claimant's pulmonologists or Dr. Usman, who treated the claimant's Hepatitis C," and the ALJ observed "[n]one of these treating specialists found the claimant to be disabled." (*Id.*). The ALJ further noted that "[t]he opinion of Dr. Vantrease is merely a recitation of the complaints made by the claimant, as indicated by her office notes of August 10, 2010 noting a consult to 'discuss disability paperwork' and followed by a list of the claimant's complaints she entitled 'Subjective' (Exhibit 31F/14)." (*Id.*). The ALJ stated that Dr. Vantrease "mentions the claimant's COPD but also her notes reflect the claimant continues to smoke cigarettes and cocaine." (*PageID#* 57). As to Plaintiff's mental impairments, the ALJ noted that "Dr. Vantrease reports the

15

claimant has had significant depression but the record contains no record of mental health treatment until January 2011 (Exhibit 33F)." (*Id.*).

Plaintiff argues that it was "unreasonable" for the ALJ to consider that Dr. Vantrease was a medical doctor, and not a mental health specialist. Plaintiff argues the ALJ's "complete disregard of Dr. Vantrease's opinion on this basis is unreasonable." (Doc. #7, *PageID#* 819).

It was not inappropriate for the ALJ, however, to consider the fact that Dr. Vantrease was not certified in the area of mental health. This constituted an application of the "specialization" factor permitted by the Regulations. *See* 20 C.F.R. § 404.1527(d)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist."). Moreover, the ALJ also considered more than simply the specialization factor in her evaluation of Dr. Vantrease's opinions.

After properly considering Dr. Vantrease's specialization, the ALJ next considered the consistency of Dr. Vantrease's disability opinion with the findings of Plaintiff's pulmonologists and Dr. Niaz Usman, who treated Plaintiff's Hepatitis C. (*PageID##* 577-580, 582-601, 683-84, 699-735). The ALJ noted that none of these specialists concluded Plaintiff was disabled. (*PageID#* 56).

Substantial evidence supports the ALJ's conclusion that Dr. Vantrease's opinion "is merely a recitation of the complaints made by the claimant . . ." (*PageID#* 56). For example, Dr. Vantrease notes that from February 2009 to January 2010, Plaintiff has "had

16

worsening depression, severe myalgias and fatigue." (*PageID#* 687). Yet treatment

notes from Dr. Vantrease during this time seem to indicate otherwise.

For example, in July 2009, treatment notes indicate Plaintiff's depression is

"stable" and that he is "doing well. Sleep and energy are good." (*PageID#* 620). It was

also noted there was a "[l]engthy discussion with the patient regarding his cocaine abuse.

He states simply that he does not want to quit. He is aware that his wife is talking [about]

leaving him because of this but says he would rather [choose] cocaine. . . . " (*Id.*). In

November 2009 it was noted that Plaintiff's depression is "improved." (*PageID#* 767).

In January 2010, Plaintiff reported during a followup visit for depression that "he is doing

okay. He denies any significant irritability. No suicidal ideation. Sleep and energy are

fair. He just had his last injection of interferon over the weekend. No alcohol use. His

last cocaine use was 2 weeks ago. He says that he is trying to quit. She [sic] does not

want any help with this." (*PageID#* 766). His depression is noted as being "stable."

(*PageID#* 765).

Three months later, in March 2010, treatment notes indicate Plaintiff's vertigo is

"intermittent. It is not associated with nausea or vomiting. No headaches or vision

changes." (*PageID#* 764). In April 2010, treatment notes from Dr. Vantrease again

indicate that Plaintiff's depression is "stable." It is also noted that Plaintiff reported he

"gets significant relief from Flexiril. Patient says he is under 50% better, he is referring

to his moods. He feels significantly better since getting off the interferon." (*PageID#*

763).

Plaintiff treated with Dr. Vantrease on August 17, 2010 – three days before the date Dr. Vantrease completed her letter opining that Plaintiff is disabled. (*PageID#* 687-88). During this visit, Plaintiff's "Chief Complaint" was listed as a "Consult" to "Discuss Disability Paperwork." (*PageID#* 759). At this time, Plaintiff now stated that "he has absolutely no stamina. He is weak and short of breath. He has approximately a quarter acre lawn which he has to [mow in] 3 sections in order to get it done. He can only do one section a day." (*PageID#* 759). Plaintiff also reported that "[h]is moods are doing fairly poorly. He is irritable and anxious. He has difficulty controlling his temper. His motivation is poor. He has difficulty being in crowds. He cannot take directions from others. No suicidal or homicidal ideations. No alcohol use. No cocaine use for 1 month." (*Id.*).

Despite treatment notes indicating Plaintiff's depression was "improved" in November 2009 and "stable" in January and April 2010, Dr. Vantrease opined in August 2010 that Plaintiff's depression had actually worsened from February 2009 to January 2010. (*Compare PageID#* 687 *with PageID##* 763-767). In her letter, Dr. Vantrease also opined that Plaintiff has "also had over one year of vertigo" that is "severe in the morning or after prolonged sitting" and "he is slightly ataxic with walking," (*PageID#* 687), yet treatment notes dated March 27, 2010 indicate that Plaintiff's vertigo has been "intermittent" and "is not associated with nausea or vomitting. No headaches or vision changes. No ataxia." (*PageID#* 764). Considering the inconsistencies between Dr. Vantrease's letter dated August 20, 2010, and other medical evidence (including her own

treatment notes), it was neither unreasonable nor inaccurate for the ALJ to conclude that

"[t]he opinion of Dr. Vantrease is merely a recitation of the complaints made by the

claimant, as indicated by her office notes of August 10, 2010 noting a consult to

'discussed disability paperwork' . . . ." (*PageID#* 56); *see* 20 C.F.R. § 404.1527(d)(4)

("Generally, the more consistent an opinion is with the record as a whole, the more

weight we will give that opinion."); *see also Cutlip v. Sec'y of Health & Human Servs.*,

25 F.3d 284, 287 (6th Cir. 1994) ("The Secretary, however, is not bound by treating

physicians' opinions, especially when there is substantial medical evidence to the

contrary.").  Accordingly, substantial evidence supports the ALJ's decision to give "little

weight" to Dr. Vantrease's disability opinions.

　　　　Plaintiff also argues the ALJ failed to properly consider the opinion of Dr. Jain.

In a letter dated August 2, 2010, Dr. Jain stated that Plaintiff has multiple medical

problems, including a pulmonary embolism, Hepatitis C, and his hypercoagulable state.

(*PageID#* 685).  Dr. Jain further opined that she felt "all of these symptoms and his

medical diagnoses . . . do significantly limit his ability to work on a full-time basis or

work at all especially during the time when he was on treatment with ribavirin and

interferon."  (*Id.*).  The ALJ considered Dr. Jain's opinion but ultimately concluded that

her opinion is entitled to "little weight."  In reaching this conclusion, the ALJ noted that

"Dr. Jain did not treat the claimant for either his Hepatitis C, his pulmonary embolism or

COPD so [Dr. Jain's] opinions regarding the effects of these impairments is given little

weight and is inconsistent with the medical evidence of record."  (*PageID#* 57).  The ALJ

19

explains further that Dr. Jain "saw the claimant briefly after his pulmonary embolism as tests initially suggested a hypercoagulable condition.  All tests administered by Dr. Jain for this condition were normal and the claimant reported no symptoms and said at almost all visits that he was feeling well.  Dr. Jain decided to treat the claimant indefinitely with Coumadin; [Dr. Jain] sees the claimant infrequently (Exhibit 3F)."  (*Id.*).

A review of the record indicates that substantial evidence also supports the ALJ's decision to give Dr. Jain's opinion "little weight."  For instance, the ALJ correctly noted that Dr. Jain did not treat Plaintiff frequently.  The ALJ also correctly noted that on the occasions Plaintiff did treat with Dr. Jain it was noted that Plaintiff was doing well.  For example, when treated on May 21, 2010, Dr. Jain indicated that Plaintiff "has been doing well" and advised that Plaintiff "will see me back in one year."  (*PageID# 690-91*).  These findings are also consistent with findings in Dr. Jain's notes from the prior visit on November 13, 2009.  During this visit, Dr. Jain reported that Plaintiff – aside from being "under [a] lot of stress given that he has not been able to get his disability to go through" – reports that "he has been well."  (*PageID# 692*).  Moreover, a careful review of the letter written by Dr. Jain on August 2, 2010, indicates that she did not specifically opine that Plaintiff was unable to work, but she felt that Plaintiff's symptoms and diagnoses "*significantly limit* his ability to work on a full-time basis or work at all especially during the time when he was on treatment with ribavirin and interferon."[6]  (*PageID#*

---

[6] Plaintiff was treated with ribavirin and interferon for an 11-month period from February 2009 to January 2010.  (*PageID#* 694).

685)(emphasis added). For the reasons discussed above, the Court finds the ALJ's decision to give Dr. Jain's opinion "little weight" is supported by substantial evidene. (*PageID#* 842).

**2.**

Plaintiff also alleges the "[t]he ALJ failed to consider the effects of each of Mr. Hadley's impairments and the combined impact thereof." (*PageID#* 821). Specifically, Plaintiff argues "[t]he ALJ failed to even mention migraine headaches or the effects of the Interferon treatment . . ." (*Id.*). Plaintiff contends, "[t]he ALJ was required to consider the effect these symptoms had on [his] ability to work, but she did not do so." (*PageID#* 822).

As Defendant correctly notes, however, a careful review of the ALJ's decision indicates she did properly consider Plaintiff's complaints of migraine headaches, as well as interferon treatment. (*PageID##* 47, 50, 52). For example, the ALJ specifically discussed Plaintiff's "yearlong treatment program with pegylated interferon and ribavarin (Exhibit 8F)," and the ALJ also specifically noted that Dr. Jacobs "diagnosed the claimant with migraines and initiated acute migraine intervention. Intravenous therapies were used. He was placed on Topomax. Dr. Vantrease noted good results from the Topomax in her office records." (*PageID##* 47, 50). Thus, despite Plaintiff's contentions otherwise, the ALJ, in fact, considered Plaintiff's migraine headaches, as well as interferon treatment in her decision. (*PageID#* 50)("The claimant does not have **an** impairment **or combination of** impairments that meets or medically equals one of the

21

listed impairments . . . ) (emphasis add).

Moreover, the mere failure of the ALJ to consider Plaintiff's migraines as "severe," instead of "nonsevere," is "legally irrelevant" because she determined Plaintiff had the following severe impairments: history of pulmonary embolism, COPD, Hepatitis C, mood disorder, and anxiety disorder. *Simpson v. Comm'r of Soc. Sec.*, 344 Fed. Appx. 181, 190-91 (6th Cir. 2009) ("This Court has previously found it 'legally irrelevant' that some of a claimant's impairments were considered non-severe, when others were found to be severe, because a finding of severity as to even one impairment clears the claimant of step two of the analysis and should cause the ALJ to consider both the severe and non-severe impairments in the remaining steps.") (internal citations omitted).

As the Court finds the ALJ properly considered Plaintiff's migraine headaches, as well as interferon treatment for Hepatitis C, Plaintiff's argument is without merit.

Accordingly, Plaintiff's Statement of Errors (Doc. #7) lacks merit.

### IT IS THEREFORE RECOMMENDED THAT:

1.    The Commissioner's non-disability determination be affirmed; and

2.    The case be terminated on the docket of this Court.

November 21, 2013

        s/Sharon L. Ovington
        Sharon L. Ovington
        Chief United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to **SEVENTEEN** days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981).